TALIAFERRO, Judge.
Plaintiffs, Theodore T. Codding and Edgar L. McCart, the former being Maintenance Supervisor of Aircraft, and the latter a sergeant, at Barksdale Field, in Bossier Parish, near Shreveport, Louisiana, each own a rather expensive trailer, manufactured by Spartan Manufacturing Company.
The defendant, Braswell Supply, Incorporated, owns and operates a cement loading plant in Bossier City, across Red River, from Shreveport.
Mrs. William J. Sandidge owns and conducts a trailer park on Yarborough Street in Bossier City, diagonally across the street from the cement loading plant, mentioned above.
McCart purchased his trailer new on March 1, 1950, and parked it upon ground leased from Mrs. Sandidge on May 1st following. Codding purchased his trailer new on March 21, 1950, and stationed it upon ground leased from her on April 1, 1950. The trailers were beside each other in the park. The “skin” or outer covering of each is of what is referred to as alelad aluminum. When new, it is very bright, silvery in color, and does not easily tarnish.
Sometime in the month of June, 1950, the appearance of both trailers was marred by discolorful stains to the aluminum “skin”, for which they seek to hold Bras-well Supply, Inc. responsible in damages and for a cause of action, each alleged:
“Petitioner shows that during the succeeding months, and particularly during the month of June, 1950, defendant did, at intervals, dump bulk cement into open trucks *853 and otherwise allow it to escape in a cloud and the same settled on the trailer of petitioner, causing a streaking and incrustation of the surface which your petitioner is informed and verily believes and therefore alleges to be a chemical change on the surface which has impaired severely the looks of the trailer and has impaired its resale value and will require the sum of $902.05 for labor and material to remedy, that is, the replacement of the outside skins which would be required to repair the said damage.
“Your petitioner further shows that the resale value or trade value of the said trailer has been impaired to the extent at least of the amount necessary to fix it, and petitioner alleges that he has been damaged to that extent.”
Neither negligence nor carelessness on the part of defendant as the cause of the damage to the trailers, is alleged.
Defendant carried property damage and public liability insurance with The Preferred Accident Insurance Company of New York, and it was impleaded as a defendant.
Through same counsel defendants filed joint answer in which they denied liability for the damages sought. The insurance company also denied that the injury to the trailers, if any, was due to accident, but avers it arose from the normal operation of the insured’s business. By taking this position the insurer virtually disclaims coverage under the policy.
In the alternative, defendants plead that if it be found and held that the insured was negligent to any extent or in any manner, and injury resulted therefrom, in that event they show that plaintiffs either knew, or by the exercise of reasonable care could have known, that the cement dust had been blown or settled upon the trailers, and they were negligent in not removing the dust before it set and became encrusted; that they were further negligent in not removing the trailers to a location not exposed to the hazard of the flying dust. Such contributory negligence is pleaded in bar of recovery by them.
On account of the obvious conflict in interest between the insured and the insurer, the former filed amended answer through counsel other than those of the insurer, wherein it prayed for judgment against the insurer for the amount, if any, for which it is cast.
Trial of the case was had on April 13, 1951. On May 28th, through appropriate proceedings, the insurer was placed in ancillary receivership in Louisiana by judgment of the Nineteenth Judicial District Court of East Baton Rouge Parish, a copy thereof being filed in the office of Clerk of Court of Bossier Parish on June 8, 1951. The Secretary of State of Louisiana was appointed ancillary receiver of the company. However, attention of the trial judge evidently was not called to this proceeding, because on June 29th he rendered judgment against Braswell Supply, Incorporated, in favor of each plaintiff for $450, and over against the insurance company in favor of the insured for the same amount.
Only Braswell Supply, Incorporated appealed. In this court the receiver for the insurer has made no appearance whatever. The appellees have answered the appeal by praying that the judgment in each of their favors be increased to the full amount for which they sued, and that a fee of $50 be fixed for Dr. John B. Entrikin, expert witness.
Hereinafter reference to defendant will mean the Braswell Supply, Incorporated. This company -has been engaged in the cement distributing business for a decade, or longer. Its main business is located in Bossier City. Its building there is so ar-. ranged that dry cement is transferred from an elevated section of the building into waiting trucks below, through what is described as a “sleeve”. At times closed trucks are used and at times open ones are used. The cement dust complained of arises when the cement falls into the truck bodies, and, of course, winds distribute it over the adjoining area, the extent of which being governed by the wind’s velocity.
Photographs in the record clearly disclose that clouds of cement dust do arise *854 from dumping dry cement into the open trucks; and Dr. Sandidge, husband of the park owner, testified that he had observed at times the sleeve, referred to, had deteriorated until only torn portions of it remained in place.
We have searched-the record in vain to determine the distance between the locus of the waiting trucks and the locus of the trailers, when injured. The trailers were diagonally across the street from the defendant’s plant. The width of the street also, is not shown.
At the time of the discovery of the discoloration of the trailers’ “skins”, plaintiff Codding was absent and did not return until July 10, 1950. The condition of Codding’s trailer was called to the attention of Sergeant McCart, by his wife, one afternoon when he returned from duty at Barks-dale Field. He believes the date was June 25th, but is not certain. He testified that during the day prior there was unusual activity at the plant, in that trucks in numbers in excess of ordinary operations, were receiving and transporting cement. Heavy clouds of road and cement dust, he says, arose. He also testified that during the night following this unusual activity there, a light, drizzling rain fell, sufficient to dampen the cement dust, but not sufficient to wash it entirely from the trailers.
One of the expert witnesses was asked to describe the discoloration on the trailers, and answered: “Brownish to near black, gray, various shades of gray, very irregular un-uniform as to color, intensity, darkness.”
The greater portion of the discoloration consisted of perpendicular areas or streaks, for the most part regular in form, which extended from the top to the lower end of the aluminum. But on the rear ends of the trailers the discoloration consists of cloud-like splotches. All of the discolorations are clearly revealed by pictures in the record.
It is shown that this is the first instance ill this park in which trailers suffered damage as above described, and the park had been in operation for several years prior to June, 1950. But it does not appear that any aluminum covered trailers were parked so near to the plant, nor so long, as these in question.
After the Codding trailer had been washed, considerable effort was made by representatives of the insurer to remove the discolorations, without any appreciable success. Approved methods and liquids, etc. were employed in the effort.
Dr. John B. Entrilcin, Professor of Chemistry at 'Centenary College, in Shreveport, Louisiana, and head of that department, was used as an expert witness by the plaintiffs. He has had over twenty years experience as a student and teacher of Chemistry. He examined both trailers and was asked by counsel of the plaintiffs, to make such tests as were necessary to determine the cause of the discolorations. He did so. Firstly, he procured a small piece of aluminum metal, such as covered the- trailers, from the Spartan Company. This metal was thoroughly cleaned and dried. He then sprinkled cement powder upon a portion of it of varied thickness, not exceeding, however, % of an inch. The dust was-then dampened with water, and, he says, allowed “to stand in my office at room temperature for a period of twenty-one (21) hours, during which time the cement was dampened twice.” Following this, he-washed the piece with plain water, alcohol and ether, and allowed it to dry. The metal was introduced in evidence. The side on which the cement experiment was made is visibly discolored and has the same appearance as the stains on the trailers. Hard rubbing does not affect it.
Following the above described experiment, Dr. Entrilcin made similar experiment on the reverse side of the piece of metal with dirt, picked up from the road’s edge between the plant and the location of the trailers, at such distances as to be relatively free of heavy cement content. After allowing this deposit to remain on the metal twenty-one hours, it was washed off in same manner as was the cement. No visible signs of discoloration resulted.
The purpose of this last experiment was-to establish whether or not dust from the ground about the locus could -have played *855 any material part in producing the discolorations. Dr. Entrildn’s opinion was that the discoloration on the piece of metal he .used and on the trailers was caused from iron in the cement. It is shown that this sort of cement has a 2% iron content. Dirt also carries iron content.
We quote the following conclusions from Dr. Entrikin’s testimony: “At the time I inspected the trailers in question, I also looked at several other trailers made by the same company, apparently of the same material situated on plots at other parts of this park. These trailers appeared to me to be as equally exposed to dirt as the trailers which were mottled. Yet, they did not show this discoloration. I also inspected casually trailers on another park, sales lot, as a matter of fact, in Bossier City, in areas where dust, I would think, was similar, and they did not show similar discolorations.”
Defendants used Dr. Charles H. Smith, Professor of Chemistry at Louisiana Polytechnic Institute at Ruston, Louisiana, tie also came to Bossier City and closely inspected the Codding trailer only. It was then cleaned again, all accumulations of dust, grit, etc. being easily removed, but the discolorations remained unimpaired. It was the opinion of Dr. Smith that the discolorations could have been caused in three ways: cement, tree sap, or dirt or soil. The tree sap possibility was ruled out when it was shown that the trailer -had not been parked under a tree at any time. He concluded his opinion by saying: “So, in my considered opinion, the stains are probably caused by both of them, (road dirt and cement).”
Dr. Smith, with Kleenex, heavily rubbed portions of the discolored areas on the Codding trailer, and subjected to scientific analyzation the light stains that were left thereon. His testimony, as to results, proves that this experiment disclosed that the discolored areas contained more iron and more calcium than were present in the original aluminum itself. On this score, we quote the doctor’s testimony, to-wit:
“Q. What was your observation there? A. I detected, the elements which were present in aluminum itself, since I rubbed-this surface. Of course, there would be some of the aluminum present in it, but in addition to that, there was more iron and more calcium than is present in this aluminum, and more iron and more calcium — no, excuse me, More — I better stop here; more iron and more calcium than is present in the aluminum. This is, something extra at least, that stayed on it.”
Dr. Smith’s observations and conclusions are concurred in by George Paul Bonner, teacher of Physics at Louisiana Polytechnic Institute. He was with Dr. Smith when the trailer was examined and participated in the experiments and analyses made thereafter.
It is shown that prior to the happening out of which this suit arose, that cement dust found its way into the trailers, and at times settled upon the grass thereabout in quantities sufficient to mar the appearance of ladies’ shoes.
The official weather report, covering the Shreveport-Bossier 'City area for June 2Sth, does not disclose any precipitation on that date. The report was unexplained by testimony. As we read it, for June, 1950, the precipitation amounted to 2.72 inches, the greatest for any one day being 1.25 inches on the 21st of that month. Seemingly, light, drizzling rains such as fell the night prior to discovery of the discolorations on the trailers, are not recorded.
The testimony convinces us that the discolorations on the trailers were caused by cement dust emanating from the Bras-well plant.
There is testimony in the record to the effect that other Spartan trailers, at other places carried similar discolorations, but the cause of such injury is not shown, nor the length of use of the trailer, nor where they had been parked since sold by the dealer. It is shown clearly that tree sap is very injurious to the hue of aluminum, and that some kinds of dirt will produce discoloration.
In cases of this character, to disclose a cause of action, and to recover damages, it is unnecessary to allege and/or *856 prove negligence. The action is not one in tort but partakes more of the nature of one to abate a nuisance. It has been said that the action in some respects is hybrid as between tort and nuisance. It is accurately described by Justice Fournet in Devoke v. Yazoo & M. V. R. Co, 211 La. 729, 30 So.2d 816, 821, when he said: “Clearly, therefore, the plaintiffs’ action is not one in tort, but, rather, one that springs from an obligation imposed upon property owners by the operation of law so that all may enjoy the maximum of liberty in the use and enjoyment of their respective properties.”
In that suit the plaintiffs sought and recovered damages because of injury to their respective properties, and for mental anguish, from smoke, soot, etc. emanating from the facilities of the defendant in Bossier City, Louisiana. As held by the Court in that case, the damages flow from the operation of a perfectly legal business in such manner as to become injurious to the property and rights of others. Revised Civil Code, Articles 667 and 668.
The following cases, recent in date, enunciate the same doctrine, viz: O’Neal et ux v. Southern Carbon Co., 211 La. 1075, 31 So.2d 216; McGee v. Yazoo & M. V. R. Co, 206 La. 121, 19 So.2d 21, and cases and text books cited therein.
To determine a correct measure of damages in the case is not free of difficulty. The only effort by plaintiffs to prove their damages is reflected from one witness’ testimony, and he says that the trade-in value of each trailer has been reduced because of the discolorations, $900. It is not contended that the value of the trailers for living quarters has been decreased to any extent. Both trailers were practically new when injured, and it is not suggested that the owners then, or since, have contemplated trading them off. To the owners the esthetic value has been materially reduced.
The Lower Court gave no written reasons for fixing the damages in each case at $450. Doubtless after hearing and observing all of the witnesses who testified in the case, and weighing all the facts and circumstances, there existed in its mind solid reason for its action. We have decided to> affirm same.
As regards fixing of expert witness fee for Dr. Entrikin, this matter should have been disposed of before appeal in the Lower Court. We cannot now do so.
As the receiver of the defunct insurance company has not appealed, the judgment against it can only be affirmed, reserving to the receiver such right, as he has, if any, to take such action as he sees fit concerning the validity of the judgment.
For the reasons herein assigned, the judgments from which appealed, are affirmed with costs.
McINNIS, J, is recused.